UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Leon Mosier, individually and on behalf of           Case No. 3:23-cv-1343
all others similarly situated,

          Plaintiff,

   v.                                                                        MEMORANDUM OPINION
                                                                   AND ORDER

Firstsource Solutions USA LLC,

          Defendant.

## I.    Introduction

On July 11, 2023, Plaintiff Leon Mosier filed a complaint seeking to establish a class action against Defendant Firstsource Solutions USA LLC, alleging Firstsource violated the Telephone Consumer Protection Act ("TPCA") by placing pre-recorded calls without the consent of the call recipients. (Doc. No. 1). Mosier subsequently filed a motion to certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure. (Doc. No. 18). In response, Firstsource filed a motion to exclude, in whole or in part, the expert reports offered by Mosier's expert witness, Aaron Woolfson, as well as a brief in opposition to Mosier's class certification motion. (Doc. Nos. 25 and 27). Mosier filed a reply brief in support of his class certification motion and a brief in opposition to Firstsource's motion to exclude Woolfson's reports. (Doc. Nos. 32 and 36). Firstsource then filed a reply brief in support of its motion to exclude. (Doc. No. 38).

## II. BACKGROUND

The TCPA prohibits, in relevant part, any person from "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C.A. § 227(b)(1)(B).

Mosier is an Ohio resident who received at least six pre-recorded calls on his personal cell phone between May 23, 2023 and July 5, 2023. (Doc. No. 1 at 7-8). Mosier learned the calls originated from Firstsource, which also uses the company name "MedAssist." (*Id.* at 4, 7-8). The pre-recorded messages Mosier received indicated that Firstsource was calling "on behalf of Mercy Hospital regarding financial assistance for a recent hospital stay." (*Id.* at 7). Mosier asserts he "did not have a stay at Mercy Hospital," and that "[h]e does not require financial assistance for a medical-related debt." (*Id.*). Mosier further alleges he never gave consent for Firstsource to contact him with pre-recorded messages. (*Id.* at 9).

Firstsource represents "that it offers eligibility and enrollment services for governmental medical assistance to uninsured and underinsured medical patients." (Doc. No. 8 at 3). Firstsource is a party to two master service agreements with two relevant entities – Mercy Health and Ensemble RCM LLC, which is one of Mercy Health's vendors. (*See* Doc. No. 30-1) (filed under seal). Mercy and Ensemble identify uninsured or underinsured patients and provides certain personal information, including contact information, for those patients to Firstsource. (Doc. No. 30-1 at 1-2). Mercy and Ensemble are responsible for obtaining each patient's consent to be contacted prior to providing the patient's name and information to Firstsource. (*Id.*).

Firstsource admits it placed the calls to Mosier's phone number. (Doc. No. 8 at 4). It did so after Mercy provided Mosier's name and contact information to Firstsource in the regular course of the parties' business relationship. (Doc. No. 30-7 at 2) (filed under seal).

2

In 2023, St. Luke's Hospital, an independent hospital in Maumee, Ohio, closed. (Doc. No. 30-6 at 1) (filed under seal). Mercy offered employment to many former St. Luke's employees, ultimately hiring "hundreds" of them for various positions in Mercy's hospital locations in the Toledo, Ohio area. (*Id.*). Mosier was offered and verbally accepted a facilities maintenance technician position with Mercy. (*Id.*). The offer was contingent upon Mosier's completion of Mercy's pre-employment screening process. (*Id.* at 1-2). Between his verbal acceptance of the employment offer and the date of his pre-employment screening, Mosier obtained employment with a different employer and did not continue to pursue employment with Mercy. (*Id.* at 2). There appears to be no dispute between the parties as to the fact that Mosier was not a Mercy patient, was not in need of financial assistance, and did not consent to be contacted by Firstsource.

Mosier now seeks to certify a class consisting of:

> All persons in the United States who (1) from July 11, 2019 through the date of class certification, (2) Firstsource called using the LiveVox dialer, (3) resulting in one or more calls with a call outcome of (a) "Partial Message Left", (b) "Machine, Left Message", (c) "Hung Up in Opening", and/or (d) "Listened" (4) on their cellular telephone numbers that (a) had not been ported in the 15 days prior to the call and (b) were supplied by Mercy to Firstsource, and (5) for whom Firstsource has no record from Mercy of consent to call.

(Doc. No. 18 at 6).

In support of his certification motion, Mosier offered a total of three declarations from Woolfson, who has "over 25 years of experience in developing and analyzing databases and telephone systems." (Doc. No. 21-3 at 2) (filed under seal). Woolfson represented that he previously has provided expert testimony in cases involving allegations of TCPA violations related to pre-recorded calls and messages sent without consent. (*Id.* at 4).

In forming the opinions he offered in his initial declaration, Woolfson reviewed call records and consent records produced by Firstsource as well as the iConnectiv™ WDNC port database and the "TelLingua national number data exchange, historical." (*Id.* at 6-7).

3

Woolfson "create[s] and analyze[s] databases using Structured Query Language (SQL)." (*Id.* at 7). In this case, Woolfson used "a set of standardized SQL queries . . . to tag each call records according to (a) the date of a telephone call; . . . (b) the disposition of the call, if one is present; . . . (c) the length of the call; and (d) any other data field contained in the call records." (*Id.* at 8). Firstsource's call records contained a total of 128,199 calls and 21,889 different accounts. Woolfson "ran SQL statements" to isolate the accounts to which Firstsource placed that did not have corresponding notices of consent in the consent records Firstsource produced[1] and to remove call records "associated with accounts for which any telephone number associated to the account was not wireless from 16 days before the date of the first call through the date of the last call." (*Id.* at 9). Woolfson's analysis identified 810 calls to 98 accounts for which Firstsource had not yet produced evidence of consent. (*Id.*).

> Woolfson reached two conclusions following his analysis of the data:
>
> It is my opinion that using the call records produced in this matter there is a reliable method to identify which calls in the call records (a) were made to telephone numbers assigned to a cellular telephone service that had not been ported within fifteen days of the calls, and (b) resulted in the transmission of pre-recorded messages.
>
> It is also my opinion that there is a reliable method to identify calls with other particular criteria based on the other data included in the call records, including specific call outcomes (i.e., "Partial Message Left", see Firstsource 000007_CONFIDENTIAL - PHI.CSV), and any other records maintained or produced by or on behalf of Defendant in this case, including whether or not a call was made to a telephone number for which Defendant has evidence of no consent,

---

[1] Woolfson characterizes the consent records as identifying accounts for which "there was evidence of no consent." (Doc. No. 21-3 at 9). This statement is not accurate. According to Charlene Jean-Palmore, the Mercy Compliance Program Manager who reviewed medical records for the relevant sample, "No" entries in the "Consent on File" column in the spreadsheet indicate only that "there was not a Patient Agreement" in the "Media" tab of a patient's medical record in Epic "on or shortly after" the patient's admission date. (Doc. No. 26-2 at 2). Jean-Palmore stated that consent might be logged in four other locations in patient records and also could be determined by speaking with the patient in question. (*Id.*).

4

which I have demonstrated using a sample of consent records provided by Defendant.

(*Id.* at 9-10).

Woolfson's first supplemental declaration, dated June 6, 2024, analyzed additional call and consent records. Woolfson identified "331 calls made to 83 telephone numbers associated with 96 different accounts included one of the following four (4) specific call outcomes: 'Partial Message Left,' 'Machine, Left Message,' 'Hung Up in Opening,' and 'Listened.'" (Doc. No. 21-2 at 2) (filed under seal). Woolfson noted that some telephone numbers were associated with more than one account. (*Id.*). He also attached to his declaration a real time report from LiveVox[2] as Exhibit 7. (*Id.* at 3-12).

Woolfson again analyzed updated call and consent records in his second supplemental declaration, dated August 23, 2024. (Doc. No. 36-1). These records contained 119 rows of data. From this data, Woolfson "identified 303 calls made to 75 telephone numbers that included one of the following four (4) specific call outcomes: 'Partial Message Left,' 'Machine, Left Message,' 'Hung Up in Opening,' and 'Listened.'" (*Id.* at 2).

Woolfson also stated that, in his experience, telephone carriers and telecommunications service providers rely on call detail reports for "billing purposes, among other things." (*Id.*). According to Woolfson, LiveVox begins "billing for calls when a connection is made. Calls with no connection are indicated as zero seconds. If a call has a non-zero duration, such as those indicated on the [LiveVox] logs, that constitutes a connected call for purposes of billing . . . ." (*Id.*). He goes on to describe how certain signaling processes establish a "bi-directional talk-path" and that, once this path is established, LiveVox can begin playing its pre-recorded message. (*Id.* at 3). The software tracks, among other things, the time at which a call became connected and the amount of

---

[2] LiveVox is a dialing platform Firstsource uses to transmit its pre-recorded calls. (*See* Doc. No. 21 at 4).

time that passes before the call is disconnected.  (*Id.* at 4).  Woolfson concluded "[a]s a result, in the Livevox CDRs, any calls with a non-zero duration represent connected calls and any calls with a disposition indicating the transmission of a recorded message, mean a recorded message played after a bi-directional talk path was opened, regardless of the configuration of the equipment by [Firstsource] or any other caller."  (*Id.* at 5).

### III.  DISCUSSION

#### A.  MOTION TO EXCLUDE EXPERT TESTIMONY

Firstsource moves to exclude "Woolfson's opinions in their entirety, including for purposes of class certification, because they are not based on an adequate factual foundation; are irrelevant and unlikely to help the trier of fact; and are generated based on unreliable methodology."  (Doc. No. 29 at 2) (filed under seal).  Firstsource also argues I must exclude Woolfson's first and second supplemental declarations because they are untimely.  (Doc. No. 38 at 3-6).

I consider Firstsource's second line of argument first.  Rule 16 of the Federal Rules of Civil Procedure requires a court to issue a scheduling order "limit[ing] the time to join other parties, amend the pleadings, complete discovery, and file motions."  Fed. R. Civ. P. 16(b)(3)(A).  If appropriate, the scheduling order also must set deadlines for the disclosure of expert witnesses and reports.  Fed. R. Civ. P. 16(b)(3)(B)(i).  The scheduling order in this case, entered following my discussion of relevant deadlines with counsel, set April 4, 2024 as the deadline for Mosier's disclosure of his certification expert, and May 2, 2024 as the deadline for Firstsource's disclosure of its certification expert.  (Doc. No. 12 at 1).

Expert disclosures must be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  Expert witnesses may file a rebuttal report "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure."  Fed. R. Civ. P.

6

26(a)(1)(D)(ii).  Rule 26(e) also requires a party to supplement or correct its disclosure, including the disclosure of an expert report, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A); *see also* Fed. R. Civ. P 26(e)(1)(B).

As I noted above, Woolfson's supplemental declarations were disclosed on June 6, 2024, and August 23, 2024, well after the April 4, 2024 deadline.  Mosier did not request leave to file these untimely declarations.  Woolfson does not describe either declaration as a rebuttal report; instead, he expressly states the declarations "supplement[]" his earlier declarations.  (*See* Doc. No. 21-2 at 1); (Doc. No. 36-1 at 1).  Therefore, Mosier may rely on the supplemental declarations only if those reports may be accurately characterized as supplemental reports.

"'Supplementation of an expert report permits a party to correct inadvertent errors or omissions.  Supplementation, however, is not a license to amend an expert report to avoid [an adverse ruling.]'"  *Corder v. Ethicon, Inc.*, No. 6:19-CV-273, 2020 WL 13616867, at *6 (E.D. Ky. Nov. 6, 2020) (quoting Wright & Miller, 8A Fed. Prac. & Proc. Civ. § 2049.11993 (3d ed.))  For the purposes of Rule 26(e), supplementation "'means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.'"  *Seton Co. v. Lear Corp.*, No. 02-71118, 2005 WL 8154366, at *2 (E.D. Mich. May 13, 2005) (quoting *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998)).

Woolfson's first supplemental declaration may, in part, fairly be characterized as "supplemental."  In that declaration, Woolfson reviewed additional records produced after his initial declaration was disclosed and further refined the universe of phone numbers potentially contacted without prior consent.  (*See* Doc. No. 21-2 at 1-2).

But Woolfson "identified 303 calls made to 75 telephone numbers that included one of the following four (4) specific call outcomes: 'Partial Message Left,' 'Machine, Left Message,' 'Hung Up in Opening,' and 'Listened.'" (Doc. No. 36-1 at 2). He also attached to his declaration a real time report from LiveVox. (*Id.* at 3-12). This information was not in his original declaration.

Woolfson's second supplemental declaration – which was filed in support of Mosier's brief in opposition to Firstsource's motion to exclude Woolfson's testimony <u>after</u> briefing was completed on Mosier's certification motion – suffers from similar flaws. While the second supplemental declaration also includes a review of updated records, Woolfson goes on to explain how he drew the conclusion that Firstsource had in fact transmitted a pre-recorded message to a given phone number. (*See* Doc. No. 36-1 at 2-5). Woolfson discusses at length how two telephone systems communicate, how LiveVox's system works, and why call durations constitute trustworthy evidence of whether a connection was established between LiveVox and the called party. (*Id.*).

None of this information was in Woolfson's original declaration, even though it was required to be included. Expert reports "must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case."

Fed. R. Civ. P. 26(a)(2)(B).

If a "supplemental" expert report "attempts to correct deficiencies or omissions in [the] original report, or otherwise seeks to bolster the conclusions contained [in its] original report, the report is not actually a supplement."  *Corder*, 2020 WL 13616867, at *6 (citations and internal quotation marks omitted)).  *See also Equal Emp. Opportunity, Comm'n v. Heartland Auto. Servs., Inc.*, No. 2:12-CV-02054, 2013 WL 12043555, at *11 (W.D. Tenn. July 19, 2013) ("The purpose of supplementation is to correct 'previously supplied information, not supplying wholly missing information.'") (quoting *Ullman v. Auto-Owners Mut. Ins. Co.*, No. 2:05-cv-1000, 2007 WL 1057397, at *3 (S.D. Ohio Apr. 5, 2007)).

While Woolfson opined "there is a reliable method to identify which calls in the call records" received pre-recorded messages, that method is not described in his original declaration.  (Doc. No. 21-3 at 1).  There is no mention of LiveVox, call durations, or the process by which pre-recorded messages are delivered anywhere in the original declaration.  In other words, the part of the first supplemental declaration discussing the LiveVox records and the second supplemental declaration "as a whole [are] designed to strengthen the expert's opinion." *Corder*, 2020 WL 13616867, at *6.

Moreover, there is no indication that this information was not available to Woolfson before he submitted his original declaration.  Woolfson represented in his original declaration that he is familiar from experience "with how dialing systems works, and how telephone systems handle inbound and outbound calls."  (Doc. No. 21-3 at 4).  But this general statement is insufficient; Rule 26 requires an expert to include in his report "a complete statement of all opinions the witness will express and the basis and reasons for them[ and] . . . the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).

Woolfson, for the first time in his first supplemental declaration, identifies four call outcomes that he states "signify[] the successful delivery of a pre-recorded message." (Doc. No. 21-2 at 2 n.1).  Woolfson's second supplemental declaration, disclosed nearly five months after the

9

April 4, 2024 certification expert disclosure deadline, was necessary to support his "reliance on the [LiveVox] call detail records to determine which calls by Firstsource resulted in the transmission of a pre-recorded voice message . . . ." (Doc. No. 36 at 7). Both the LiveVox portion of Woolfson's first supplemental declaration and his second supplemental declaration set forth additional substantive bases to support his opinions, rather than to correct inaccuracies or to provide subsequently acquired information. Therefore, those declarations are not properly characterized as a "supplemental report," and they were not timely disclosed as required by Rule 26.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Sixth Circuit has adopted a five factor test to asses whether a party's violation of Rule 26 is substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (citation and quotation marks omitted). A court "need not apply [these factors] rigidly." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (citation and quotation marks omitted). The non-disclosing party has the burden to "prove harmlessness." *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 272 (6th Cir. 2010).

The first three factors weigh in favor of Firstsource. Mosier was required to disclose all of the bases for Woolfson's opinions and his failure to do so in a timely manner subjected Firstsource to undue surprise. Moreover, Firstsource has limited avenues to remedy this surprise. Woolfson's first supplemental declaration was filed a month after the rebuttal expert disclosure deadline. Similarly, Woolfson's second supplemental declaration was filed long after the deadlines for class

10

certification expert discovery had passed, as well as weeks after briefing was completed on Mosier's motion for class certification.  And, while this case is not at the trial stage, admitting the evidence contained in the LiveVox portion of the first supplemental declaration and the second supplemental declaration would be very disruptive, as it would require re-opening expert discovery as well as a new round of motion practice concerning class certification.

The fourth factor, importance, "in a sense[] cuts both ways.  The more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure." *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, No. 5:16-CV-150, 2017 WL 2295906, at *5 (E.D. Ky. May 25, 2017), *objections overruled sub nom. EQT Prod. Co. v. Magnum Hunter Prod. Co.*, No. 5:16-CV-150, 2017 WL 4974782 (E.D. Ky. July 19, 2017) (citations omitted).  The evidence is important to Mosier, as the evidence contained in the challenged supplemental declarations is important to the determination of whether a pre-recorded message was transmitted to someone who had not previously given their consent.  But the non-disclosure also is important to Firstsource, who did not have access to the information prior to its deadline for disclosing its expert rebuttal report or, in the case of Woolfson's second supplemental declaration, prior to filing its brief in opposition to Mosier's motion for class certification.

Lastly, there is nothing to consider for the fifth factor.  Mosier did not acknowledge that the untimeliness of the supplemental declarations or offer any explanation for the failure to disclose them in a timely manner.

I conclude Mosier has not met his burden to show his failure to comply with his Rule 26 obligations was substantially justified or harmless.  Therefore, I exclude the LiveVox portion of Woolfson's first supplemental declaration and his second supplemental declaration in full.  I will not consider that evidence in evaluating Mosier's motion for class certification.

### B.   MOTION FOR CLASS CERTIFICATION

Rule 23 requires a proposed class action plaintiff to show "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). *See also Pilgrim v. Universal Health Card,* LLC, 660 F.3d 943, 945-46 (6th Cir. 2011).

The plaintiff also must show the proposed class fits within one or more of the categories described in Rule 23(b). Mosier seeks to certify a class pursuant to Rule 23(b)(3), which provides that "a class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Further, "[t]he matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action."

Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original).

12

I conclude Mosier has not met his burden to show "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While Woolfson opined that "there is a reliable method to identify which calls in the call records . . . resulted in the transmission of pre-recorded messages," his admissible declarations do not explain what that method is. (Doc. No. 21-3 at 9-10). Woolfson outlines the process by which he identified telephone numbers that lacked corresponding consent records. (*Id.* at 8-9). But Woolfson does not explain in his original declaration how to determine whether a pre-recorded message actually was transmitted, much less how to accomplish this on a class-wide basis.

Mosier's failure to timely disclose all of Woolfson's opinions, as well as the facts and data supporting them, ultimately dooms his motion for class certification, as he offers no other way to determine which other individuals Firstsource called might have received a pre-recorded message. I conclude he fails "to prove that there are in fact sufficiently numerous parties." *Wal-Mart*, 564 U.S. at 350. Therefore, I deny his motion for class certification.

### IV. CONCLUSION

For the reasons stated above, I grant Firstsource's motion to exclude Woolfson's first supplemental declaration as to the discussion of the LiveVox records and to exclude his second supplemental declaration as untimely. (Doc. No. 25). I deny the motion as the sections of the first supplemental declaration that discuss the updated call and consent records. I further deny Mosier's motion for class certification.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge